## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| JACKIE S. BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:16-CV-423-TLS |
| | ) | |
| DENISE ANTINNUCCI, CHERYL FREIUMTH, | ) | |
| JAMES CRANE, and the UNITED STATES, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Defendants' Motion to Dismiss [ECF No. 45]
which is directed at all nine counts of the Plaintiff's Second Amended Complaint. For the
reasons set forth in this Opinion and Order, the Motion is granted in part and denied in part.

## COMPLAINT ALLEGATIONS

Plaintiff Jackie Bennett, through a Second Amended Complaint, pursues claims against
three federal employees and the United States of America. Defendants Denise Antinucci and
Cheryl Freimuth are employees of the United States Postal Service. Defendant James Crane is a
special agent of the United States Postal Service—Office of Inspector General. These Defendants
are sued in their individual capacities for the damages the Plaintiff seeks to recover for violations
of her constitutional rights as set forth in Counts I and II. These are *Bivens* claims, so named for
the Supreme Court's decision in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388
(1971). In Counts III, IV, V, VI, and VII, the Plaintiff relies on the Federal Tort Claims Act
(FTCA) to seek relief for violations of Indiana state law. The United States is recognized as the
proper Defendant for the state law claims pursuant to the doctrine of respondeat superior. In the

final count (written as Count III, but holding the place of Count IX in the Second Amended Complaint), the Plaintiff cites 42 U.S.C. § 1983, and names Crane and the United States as Defendants.

According to the Second Amended Complaint, the Plaintiff worked as a Sales and Service/Distribution Agent at the United States Post Office in Monroeville, Indiana. She resigned her post on January 24, 2014. About a month later, the Plaintiff received a Letter from Antinnucci in her capacity as local Postmaster.[1] The "Letter of Demand for Indebtedness for Employee Financial Accountability" stated that it was notice of the "US Postal Service's intention to collect from you the sum of $848.97. This debt is based on a shortage in your office accountability." (2/24/14 Letter, ECF No. 46-1.)[2] The Letter cited the "National Agreement" as the basis for holding employees "financially liable for the proper care and handling of US Postal Service funds." (*Id.*) It also noted that it was the Plaintiff's right under the National Agreement to file a grievance within fourteen days.

"[The Plaintiff] did not agree that any funds were owed by her, and did not admit to taking any funds from the Post Office. However, she felt intimidated and under extreme pressure, and did not want to be pursued or harassed by the U.S. Postal Service, so on or about March 3, 2014, she paid the amount as demanded." (Second Am. Compl. ¶ 21.) The Plaintiff believed that

---

[1] The letter was not attached to the Second Amended Complaint, but the Defendants provided it as an exhibit to their Brief in Support of Motion to Dismiss. "[I]n deciding a Rule 12(b)(6) motion, a court may consider 'documents attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to his claim." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (quoting *Wright v. Assoc. Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994)). Because the letter fits into the incorporation-by-reference doctrine, the Court will quote directly from the letter.

[2] The date written on the Letter is February 24, 2013, but there is no dispute that the correct date was February 24, 2014.

the Letter implied that criminal charges would be brought against her if she did not make the payment.

On March 14, 2014, Special Agent Crane contacted the Plaintiff and confronted her about the missing money. The Plaintiff denied taking any money, and told Crane that she had paid the amount demanded to avoid problems. Crane indicated that he was not aware payment had been made. The Plaintiff and Crane had no further contact, and the Plaintiff believed the matter was resolved. (*Id.* ¶ 23–24.)

Nine months later, on December 15, 2014, the Plaintiff was charged in the Allen Superior Court with Theft and Official Misconduct, both Class D felonies under Indiana statute. The Affidavit for Probable Cause, completed by Crane on December 4, 2014, asserted his belief that sometime during the period of time between May 4, 2013, and January 24, 2014, the Plaintiff committed the crimes. Crane wrote that he based "his belief on the fact that he has personal knowledge of the following information or has learned of it from another law enforcement officer and he also reviewed relevant business records and interviewed witnesses with personal knowledge of the events or information detailed" in the Affidavit. (Aff. for Probable Cause, ECF No. 41-1 at 14.) According to Crane's Affidavit, on January 29, 2014, the Postal Service Office of Inspector General received information from Antinnucci regarding financial discrepancies related to the Plaintiff, who had started her employment with the Postal Service on May 4, 2013, in the retail unit of the Hoagland Post Office where she conducted sales transactions. On January 24, 2014, the Plaintiff resigned from her position without prior notice and left the building before closing her cash drawer for the day. An initial audit of the Plaintiff's cash drawer disclosed a shortage of nearly $1,000, which later investigation determined was $848.97. The Affidavit

stated that a Letter of Indebtedness had been issued to the Plaintiff, and that Crane contacted the

Plaintiff on March 14, 2014, by telephone to schedule an interview related to his investigation of

the financial discrepancies. He noted that the Plaintiff admitted paying back the shortage and

agreed to schedule an interview in the future after reviewing her current work schedule.

According to the Affidavit, the Plaintiff did not contact Crane to schedule the interview, and

follow-up attempts to contact her in April and July 2014 were unsuccessful. On November 12,

2014, Crane received confirmation through the U.S. Postal Service Accounting Service Center

that, on March 12, 2014, the Plaintiff had paid the funds demanded in the Letter of Indebtedness.

      After a hearing, a state court judge found probable cause to issue the arrest warrant. The

Plaintiff was arrested on Thursday, December 18, 2014. On December 24, she was released on

$5,000 bond. The next day, her employer, a local nursing home, called to inform the Plaintiff that

her employment had been terminated, which the Plaintiff believed was a result of her arrest.

      On December 19, 2014, the day after the Plaintiff's arrest, Krista Carr, the Postmaster

from Liberty, Indiana, conducted a thorough audit of the Monroeville Post Office. The result of

Carr's audit prompted Crane to send an email to the deputy prosecuting attorney to advise that he

had recently learned "through a very reliable financial source" that the shortage was the result of

a records/book keeping error on the Plaintiff's part. (Crane's email, ECF NO 41-1 at 20.) Crane's

email included the pertinent memorandum from Carr as an attachment.

      Carr's memorandum, which is not dated, clarified two separate "counts" that had been

conducted at the Monroeville branch. The first was performed on January 29, 2014, when the

Plaintiff resigned, and the second was conducted on June 28, 2014, in response to a different

employee's resignation. It noted that the overage recorded on June 28, when considered against

the actual overage of the two clerks on that date, was "the exact same amount of the actual shortage that Jackie Bennett had on January 29, 2014, prior to the [improper] manipulation of other individual credits added to the shortage[,] then another individual credit overage subtracted from the total amount." (ECF No. 41-1 at 21 (noting additionally that "you cannot give an overage amount to a shortage from another credit unless you can find a direct correlation between the two")).) Carr wrote,

> My findings indicate there was never a shortage to begin with. The documentation for this financial mess is exactly that—a mess! This office is in terrible shape—not only on the financial side but also in every instance.

> I spoke to Special Agent, James Crane with the office of Inspector General in regards to this case. According to Agent Crane, Jackie Bennett has paid the full amount of $848.97. The Office of Inspector General had also started the prosecution of Jackie Bennett for theft charges.

> Jackie Bennett needs to be reimbursed for the full amount that she has paid back—$848.97 along with an apology.

> In my opinion, the office should never have been transferred to Jackie when it was clearly in such deplorable conditions. She had only been with the Postal Service for approximately 5 months and put in an office that would take someone with years of experience and many extra hours to clean up.

(*Id.* at 22.)

On January 8, 2015, the deputy prosecuting attorney filed a Motion to Dismiss the charges against the Plaintiff on grounds that the Office of Inspector General believed, based on newly discovered evidence, that the suspected shortage of funds was the result of an accounting error, and not theft. The motion was granted that same day.

## STANDARD OF REVIEW

"A motion to dismiss pursuant to [Rule] 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). When reviewing a complaint attacked by a Rule 12(b)(6) motion, the Court must accept all of the factual allegations as true and draw all reasonable inferences in the light most favorable to the Plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). And while a complaint need not contain detailed facts, surviving a Rule 12(b)(6) motion "requires more than labels and conclusions . . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Because the purpose of a motion to dismiss "is to test the factual sufficiency of the statement of the claim for relief; the motion is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (3d ed.).

## ANALYSIS

### A.    Constitutional Claims under *Bivens* – Counts I and II

The Plaintiff, in Counts I and II of the operative Complaint, alleges that each of the individual Defendants violated certain constitutional guarantees, and are personally liable to her for damages pursuant to the Supreme Court's holding in *Bivens*. In Count I, she contends that their conduct was "an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be a violation of Substantive Due Process." (Second. Am. Compl. ¶ 52.) Count II is based on the Fourth Amendment's protections against unreasonable search and seizure. The Plaintiff alleges that Antinnucci and Freimuth provided false information that resulted in criminal charges, and that Crane submitted an application for a warrant attesting that he had personal knowledge and had reviewed relevant business records to support the application, even though the records revealed that there was no probable cause for her arrest.

In *Bivens*, the United States Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). It is the "federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983." *Iqbal*, 556 U.S. at 675–76 (quoting *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006)). Accordingly, as with § 1983 suits, vicarious liability does not apply and a "plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676. "The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.*

7

The Defendants argue that the Plaintiff has not set out facts from which the Court can infer that they violated her constitutional rights. They further assert that dismissal is appropriate because they are entitled to qualified immunity. Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome a defense of qualified immunity at the pleading stage, the complaint must contain sufficient factual allegations to show that the defendant's conduct violated a constitutional right and that the right was clearly established at the time of the alleged violation. *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

1.      ***The Fourth Amendment***

The Court can find no factual allegations against Antinnucci or Freimuth in the Second Amended Complaint that would permit a reasonable inference that either of them is liable to the Plaintiff for violating the Fourth Amendment's prohibition against unreasonable seizures. Count II is based on Antinucci and Freimuth "provid[ing] false information that resulted in criminal charges against [the Plaintiff]." (Second Am. Compl. ¶ 57.) However, the specific factual allegations, contained in paragraphs 17 through 50, do not provide any detail regarding Freimuth's role or describe any of the information she provided, much less any that was false. The only mention of Freimuth in the Complaint is to identify her as a resident of Indiana and an employee of the United States Postal Service. (Second. Am. Compl. ¶10.) Carr's memo identifies Freimuth as one of the employees, along with Antinucci, who conducted the January 29 count of

8

individual stamp credits and unit reserve credit when the Plaintiff resigned. This action did not make Freimuth personally involved in the Plaintiff's arrest and detention, and Count I is dismissed as to Freimuth.

With respect to Antinucci, it can be gleaned from the Complaint and the attached documents that Antinnucci was involved in the January 29 count, that she contacted Crane about the financial discrepancy in the Plaintiff's drawer, and that she sent the Letter to the Plaintiff demanding repayment for the shortage. While these actions preceded the seizure by nearly a year, they cannot be said to be the cause of the seizure. Contacting an investigator, who then decides whether to pursue an investigation, is not grounds for a Fourth Amendment violation where nothing suggests that the person "actively instigated or encouraged the prosecution of the plaintiff." *See Curtis v. Bembenek*, 48 F.3d 281, 286 (7th Cir. 1995). The allegations do not suggest that Antinnucci played such a role. Antinnucci's other action, sending the Plaintiff the Letter in accordance with the labor agreement that governs the United States Postal Service and its employees' union, does not implicate the Fourth Amendment. Count I is dismissed as to Defendant Antinnucci.

In light of Crane's role, and the allegations against him, a different analysis is required to assess the plausibility of the claim against him, and whether he is entitled to qualified immunity. At the time of the events, the Fourth Amendment right to be free from seizure unless probable cause exists to believe the person has committed a crime was well established. *See Bailey v. United States*, 568 U.S. 186, 192 (2013) (noting that the probable cause standard is deeply rooted in our history and "represents the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest 'reasonable'

under the Fourth Amendment") (quoting *Dunaway v. New York*, 442 U.S. 200, 208 (1979) (brackets omitted)); *see also Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 918 (2017) (reiterating that "[t]he Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause"). *Bivens* itself involved a Fourth Amendment claim against federal agents for violating the prohibition against unlawful searches and seizures when they handcuffed a man in his home and conducted a search without a warrant. *See Bivens*, 403 U.S. 388. Therefore, the question of qualified immunity, as it concerns Crane, will turn on whether Crane acted in "an objectively reasonable manner" in completing the affidavit for probable cause. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). He "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Id.* There is no qualified immunity where the "warrant application [is] so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Id.* at 345.

Read as a whole, the Complaint contains sufficient factual allegations to proceed further on the question whether Crane acted in an objectively reasonable manner when he completed the affidavit asserting that probable cause supported the Plaintiff's arrest for theft. The allegations support an inference that Crane authored the affidavit before obtaining any financial analysis of the report of a financial discrepancy related to stamp credits and unit reserve credit, even though the same dollar amount had later been reported as an overage that would have balanced out the shortage. It is unknown how much information he sought, or from what sources. He submits that he "interviewed witnesses with personal knowledge of the events or information detailed" in the affidavit, but does not identify those witnesses other than to state that Antinucci reported a

financial discrepancy. (Aff. for Probable Cause, ECF No. 41-1 at 14.)

The sole basis for alleging that the financial discrepancy was due to the Plaintiff stealing from the U.S. Postal Service was that a shortage was recorded on the same day that the Plaintiff quit her job, and that she subsequently paid that amount in satisfaction of the shortage. The affidavit describes the "shortage" as occurring after an "audit of Defendant Jackie S. Bennett's cash drawer." (Aff. for Probable Cause, ECF No. 41-1 at 15.) The implication of this sparse information may well be misleading, depending on what Crane knew or should have known. It is arguably different than what would have been connoted if all pertinent information about the nature of that count—that it was a count of "individual stamp credits and unit reserve credit" and that another employee had an overage during the same count—had been set forth in the affidavit. (Carr Memo, ECF No. 41-1 at 21). Additionally, the affidavit added that Crane and the Plaintiff had agreed to schedule an interview, but that the Plaintiff never scheduled the interview and Crane's further attempts to contact her were unsuccessful. The Complaint alleges that the Plaintiff talked to Crane only once, and that the Plaintiff thought the matter was closed. It does not mention any further attempts for an interview. It is not appropriate at this stage of the proceedings to determine whether a reasonably well-trained investigator would have known that he should not have applied for the warrant under the circumstances of this case, or whether it would have been clear to a reasonable officer in his position that his conduct violated the Plaintiff's constitutional protections.

Count II of the Second Amended Complaint remains pending against Defendant Crane, but is dismissed as to Defendants Antinnucci and Freimuth.

11

2.      *The Fifth Amendment*

The Fifth Amendment substantive due process claim is purportedly based on "an abuse of executive power" that was not justified "by any legitimate objective of law enforcement." (Pl.'s Second Am. Compl. ¶ 52.) Its factual basis, as far as the Court can tell from the Complaint, is the same as the facts that are cited in support of the Fourth Amendment claim. However, "[w]here a particular Amendment provides an explicit textual source of constitutional protection 'against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process,' must be the guide analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."); *Case v. Milewski*, 327 F.3d 564, 568 (7th Cir. 2003).

Here, the underlying conduct for the substantive due process count was the Defendant's failure to analyze the records to determine if they supported an allegation of theft before taking action that led to the Plaintiff's arrest. The resulting harm was the Plaintiff's arrest and the initiation of a prosecution. The Plaintiff does not advance any allegations that render her substantive due process claim distinct from her claim under the Fourth Amendment. Count II of the Second Amended Complaint will be dismissed.

**B.      Federal Tort Claims Act – Counts III–VIII**

"Generally, an individual may not sue the United States for tortious conduct committed by the government or its agents." *Williams v. Fleming*, 597 F.3d 820, 822 (7th Cir. 2010) (citing *United States v. Navajo Nation*, 556 U.S. 287, 289 (2009) ("The Federal Government cannot be sued without its consent.")). However, Congress created an exception, the Federal Tort Claims Act (FTCA), through which the United States has assumed liability for its employees' torts as if it were a private employer. Suit is permitted against the United States

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

**1.      *Torts Based on Misrepresentation***

The FTCA's broad waiver of immunity is subject to several qualifications. *See, e.g.*, 28 U.S.C. § 2680. The Defendants argue that many of the Plaintiff's tort claims are barred by the "misrepresentation" exception to the FTCA. The FTCA excludes from coverage "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." 28 U.S.C. § 2680(h) (emphasis added).[3] The exception encompasses claims arising out of negligent, as well

---

[3] The exception for claims arising "out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" does not apply if they involved "acts or omissions of investigative or law enforcement officers of the United States Government." 28 U.S.C. § 2680(h). Accordingly, the United States does not argue that any other exception from this section applies to this case.

as willful, misrepresentation. *United States v. Neustadt*, 366 U.S. 696, 702 (1961). The

misrepresentation exception relieves the government of tort liability for injuries which are

"wholly attributable" to reliance on government misstatements, "[b]ut it does not bar negligence

actions which focus not on the Government's failure to use due care in communicating

information, but rather on the Government's breach of a different duty." *Block v. Neal*, 460 U.S.

289, 297 (7th Cir. 1990). Accordingly, a complaint alleging claims under the FTCA that are

"based on the government's failure to use due care in communicating information upon which

the recipient relies . . . are barred by the misrepresentation exception and those claims that are

based on the breach of another distinct duty by the government are not barred." *Janowsky v.*

*United States*, 913 F.2d 393, 396–97 (7th Cir. 1990).

> [t]he exclusion of claims of misrepresentation is designed to protect the government
> from being sued for fraud and other torts that come under the general legal heading
> of misrepresentation, whether intentional or negligent, injuring merely the
> pocketbook. It does not exclude claims of physical injury that happen to involve, as
> many do, an element of communication or misleading silence.

*Murrey*, 73 F.3d 1448, 1450–51 (7th Cir. 1996) (internal citations omitted). Were it otherwise,

the exception could be construed to preclude "[a] number of traditional torts" that "involve either

misrepresentation or, what is analytically very similar, a misleading failure to disclose true facts,"

even though the latter torts are "correctly assumed to be within the scope of the government's

waiver of sovereign immunity in the [FTCA]." *Krejci III v. U.S. Army Material Dev. Readiness*

*Command*, 733 F.2d 1278, 1280 (7th Cir. 1984) (recognizing that an FTCA injury claim is not

barred by the misrepresentation exception in a case where a government truck driver "carelessly

signals cars to pass him," causing an accident even though the "truck driver's signal

misrepresents the condition of the road ahead").

14

In general, the allegations in the Second Amended Complaint regarding the events that led up to, and accompanied the Plaintiff's arrest, are not precluded by the misrepresentation exception. Most of the Plaintiffs' claims rely on the breach of a duty distinct from a duty related to the communication of information. For example, the Plaintiff's conversion claim is not as much about the post office's communication to the Plaintiff that she was responsible for a shortage, as it about the Governments' failure to return the money after the criminal charges against the Plaintiff were dismissed. Likewise, the claims for malicious prosecution and false arrest relate to duties not to misuse the judicial system, or to restrain a person's liberty without probable cause.

**2.      *Extortion and Conversion – Count III***

The Plaintiff alleges that she paid the United States Postal Service personal funds for a debt she did not owe "upon threat of criminal prosecution from Defendant Antinnucci." (Second Am. Compl. ¶ 62.) The United States then failed to refund the improperly converted money, and continues to exercise control over those funds.

a.      *Extortion*

Even if the extortion claim does not fall within the FTCA's misrepresentation exception, it is not supported by the facts that are alleged in the Second Amended Complaint. The United States can only be held liable under the FTCA if Antinucci's actions, if taken by a private person, would make her liable to the Plaintiff under Indiana law. The Court finds no plausible basis to conclude that the Letter could form the basis of a civil suit for extortion. The Letter of

Indebtedness did not reference a criminal prosecution. Rather, it stated an intent to collect a sum on behalf of the United States Postal Service for a debt based on a shortage in the Plaintiff's office accountability, and provided a means by which to challenge whether she was personally liable. There was nothing in the Letter to suggest that payment of the debt would be pursued through criminal prosecution, much less an explicit extortionate threat of the same.

      b.    *Conversion*

Conversion is a recognized tort in Indiana, but money can only be the subject of an action for conversion if it is capable of being identified as a special chattel; it must "be a determinate sum with which the defendant was entrusted to apply to a certain purpose." *Stevens v. Butler*, 639 N.E.2d 662, 666 (Ind. Ct. App. 1994); *see also Bowden v. Agnew*, 2 N.E. 3d 743, 750 (Ind. Ct. App. 2014). For example, "refusal to pay a debt will not generally support a conversion claim." *Bowden*, 2 N.E.3d at 750.

Here, the money the Plaintiff paid was intended to satisfy the specific shortage discovered through an accounting of the Plaintiff's drawer. However, nothing in the complaint allegations plausibly suggests that these funds, when paid, were to be placed in a specific account, or that a possessory interest would continue to exist in those specific funds. *See Kopis v. Savage*, 498 N.E.2d 1266 (Ind. Ct. App. 1986) (holding that a seller's retention of a $40,000 deposit after the property deal collapsed was not criminal conversion because he was under no contractual obligation to "return the specific $40,000 which [purchaser] had given him" as the parties did not set up an escrow account or deliver the money to a third party for safekeeping). Likewise, here, the Government is not obligated to return the specific $848.97 that the Plaintiff paid in response

to the Letter of Indebtedness. Accordingly, Count III of the Second Amended Complaint does not state a claim upon which relief can be granted under the FTCA.

**3.**        *Intentional and/or Negligent Infliction of Emotional Distress – Count IV*

       a.        *Intentional Infliction of Emotional Distress*

The Indiana Supreme Court first recognized intentional infliction of emotional distress (IIED) as a separate, individual tort in *Cullison v. Medley*, 570 N.E.2d 27 (Ind. 1991). IIED occurs when "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Cullison*, 570 N.E.2d at 31. Intent forms the primary basis for an IIED claim. *Id.* The requirements are construed rigorously, and a successful plaintiff must show that the defendant (1) engaged in extreme and outrageous conduct (2) which intentionally or recklessly (3) caused (4) severe emotional distress to another. *Lindsey v. DeGroot*, 898 N.E.2d 1251, 1264 (Ind. Ct. App. 2009).

The facts alleged in the Complaint show that Antinucci believed that money was missing when the Plaintiff resigned her position, and she therefore demanded payment in accordance with the National Agreement's provision regarding an employee's responsibility for the proper care and handling of postal service funds. She also advised an investigator, Crane, about the financial discrepancy. Crane pursued criminal charges after learning that the Plaintiff had paid the amount that was reported missing. That no money was actually missing, and an accounting error or "shoddy bookkeeping" (Second Am. Compl. ¶ 50), was the actual cause of the shortage, was not determined until later. None of these allegations describe behavior that "exceeds all bounds typically tolerated by a decent society," *Curry v. Whitaker*, 943 N.E.2d 354, 361 (Ind. Ct. App.

2011) (citing *Lindsey*, 898 N.E.2d at 1264), or conduct so extreme in degree that it should be

"regarded as atrocious and utterly intolerable in a civilized society," *See Bradley v. Hall*, 720

N.E.2d 747, 752–53 (Ind. Ct. App. 1999) (quoting Restatement (Second) of Torts § 46). To the

contrary, Antinucci relied on the systems that were in place and intended to track postal service

revenue and recover missing monies when she contacted the Office of Inspector General. That

office is responsible for performing audits and reviews and investigating potential crimes

involving the United States Postal Service. Crane's actions, even if negligent or reckless, were in

accordance with the duties of that office.

     Also absent from the pleading is any factual allegation that would support a reasonable

inference that the Defendants intended to cause the Plaintiff emotional distress by their actions.

*See Cullison*, 570 N.E.2d at 31 (intent to cause emotional harm to plaintiff constitutes basis for

the tort of intentional infliction of emotional distress). Accordingly, the IIED claim against the

United States is dismissed.

     b.    *Negligent Infliction of Emotional Distress*

     Under Indiana law, a plaintiff may recovery for emotional trauma negligently inflicted by

another. Negligence consists of (1) a duty owed by the tortfeasor to the tort victim, (2) a breach

of that duty, and (3) an injury to the tort victim proximately caused by the breach. *Estate of Mintz

v. Conn. Gen. Life Ins. Co.*, 905 N.E.2d 994, 998–99 (Ind. 2009). To maintain a cause of action

for negligent infliction of emotional distress under Indiana law, a plaintiff must satisfy the

"modified impact rule." *Alexander v. Scheid*, 726 N.E.2d 272, 283–84 (Ind. 2000). "[T]he

purpose of the rule is to confine recovery to those with 'direct involvement' in the defendant's

negligent act or omission." *Id.* at 284. "[T]he modified impact rule does not require that the impact be initiated by the tortfeasor." *Bader v. Johnson*, 732 N.E.2d 1212, 1222 (Ind. 2000) (citing *Conder v. Wood*, 716 N.E.2d 432, 435 n.3 (Ind. 1999)).

The Plaintiff, as the person who was arrested and detained, was directly involved in the tort that she alleges caused her to suffer emotional trauma. *See, e.g.*, *Keim v. Potter*, 783 N.E.2d 731, 735 (Ind. Ct. App. 2003) (holding that a mistaken diagnosis of hepatitis C, a life-altering and potentially deadly illness, was sufficient "direct involvement" to allow a recovery for negligent infliction of emotional distress). Accordingly, it is plausible that, if the Plaintiff can establish that the United States, through the actions of Crane, is liable to her in tort for causing her arrest, she will be able to pursue damages for emotional distress.

4.      ***False Reporting, Deceit and Misrepresentation Leading to False Arrest – Count V***

The Plaintiff alleges that "[t]he actions of the Defendants, and each of them, in presenting and using false information about an alleged theft, which never occurred, amounts to torts of false reporting, deceit and misrepresentation leading to false arrest." (Second Am. Compl. ¶ 80.) To the extent the Plaintiff is attempting to recover for intentional torts related to the handling of information, it falls under the intentional tort exception of § 2680(h). Additionally, the Plaintiff's Complaint does not identify any knowingly false information (as opposed to mistaken information, incomplete information, or omissions) relayed by any of the Defendants in the context that would support a state law claim for false reporting or deceit. Count V of the Second Amended Complaint is dismissed.

## 5.      *False Arrest and False Imprisonment – Count VI*

The Plaintiff claims that the United States is liable to her for the actions that caused her to be falsely arrested, and her liberty restricted for an extended period of time. Generally, to succeed upon a claim of false arrest or false imprisonment, Indiana law requires a plaintiff to establish the absence of probable cause for the arrest. *See Garrett v. City of Bloomington*, 478 N.E.2d 89, 93 (Ind. Ct. App. 1985); *see also Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003) ("A defendant may be liable for false arrest when he or she arrests a plaintiff in the absence of probable cause to do so."). The United States argues that, as found by the state court judge, probable cause existed on December 4, 2014, to think that the Plaintiff had committed theft. They cite her prompt payment in response to the demand for payment, rather than pursuit of a grievance or other protest. The Court, as it did above in the Fourth Amendment analysis, finds that the factual allegations are sufficient to proceed further on the issue of whether the Plaintiff's arrest was unreasonable.

## 6.      *Malicious Prosecution, Abuse of Process, and Slander*

To prevail on a claim of malicious prosecution in Indiana, a plaintiff must establish that the defendant, acting with malice and without probable cause, instituted or caused to be instituted a prosecution that terminated in the plaintiff's favor. *See City of New Haven v. Reichhart*, 748 N.E.2d 374, 378 (Ind. 2001); *Glass v. Trump Ind., Inc.*, 802 N.E.2d 461, 466–67 (Ind. Ct. App. 2004). "The essence of a malicious prosecution action rests on the notion that the plaintiff has been improperly subjected to legal process." *Glass*, 802 N.E.2d at 466 (citing *Reichhart*, 748 N.E.2d 374). Indiana court have that "a judicial determination of probable cause in a criminal

proceeding constitutes prima facie evidence of probable cause in a subsequent civil lawsuit alleging malicious prosecution." *Id.* at 467 (citing *Conwell v. Beatty*, 667 N.E.2d 768, 778–79 (Ind. Ct. App. 1996)). The plaintiff may overcome such a prima facie showing of probable cause only by demonstrating that it was induced by false testimony, fraud, or other improper means, such as the defendant withholding material facts. *Id.* "When a judicial determination of probable cause has been made, the prima facie case cannot be overcome by a showing of a negligent failure to investigate thoroughly where there is some factual basis for bringing a claim. More than mere negligence must be shown to rebut the prima facie case." *Id.* (quoting *Conwell*, 667 N.E.2d at 778). Malice "may be inferred from a total lack of probable cause, from the failure to make a reasonable or suitable inquiry, and from a showing of personal animosity." *Kroger Food Stores, Inc. v. Clark*, 598 N.E.2d 1084, 1089 (Ind. Ct. App. 1992).

Here, Crane submitted an affidavit for probable cause, a prosecutor filed an Information for Theft and an Information for Official Misconduct, and a state court judge then made a judicial determination of probable cause. The Complaint does not identify false testimony or fraud that induced the finding of probable cause and would rebut the presumption of probable cause. Rather, the implication from the Complaint is that Crane, who was responsible for the investigation, failed to review existing documents that would have shown that the shortage he attributed to theft was the result of an accounting error, even though he averred that he reviewed "relevant business records." (Aff. for Probable Cause, ECF No. 41-1 at 14.) Additionally, he attributed guilt to the Plaintiff because she paid the amount that was demanded in response to the shortage, even though she was the one who told him about the payment. The Complaint allegations also provide a potentially differing account of Crane's attempts to contact the

Plaintiff. At this preliminary stage of the proceedings, the Court does not address the merits of the claim to determine whether the failure to investigate thoroughly, or omissions in the probable cause affidavit, were the result of negligence, or something more. The Complaint contains sufficient factual allegations to proceed further on the claim against the United States based on the actions of Crane in pursuing criminal charges, as the Plaintiff has given "enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (describing the plausibility standard).

As part of Count VII, immediately following the claim of malicious prosecution, the Complaint alleges that "[t]he actions of the Defendants slandered the Plaintiff." (Pl.'s Am. Compl. ¶ 95.) The Complaint does not provide the basis for this claim, either factually or legally. To the extent the Plaintiff intended to assert a separate claim for "slander," it is dismissed.


7.    *Negligent Hiring and Training – Count VIII*

"In light of the cases cited by the Defendants, Plaintiff concedes that negligent hiring is not a tort recognized in Indiana for employers that are government units." (Pl.'s Mem. in Opposition 15, ECF No. 51.) Count VIII of the Second Amended Complaint is dismissed.


C.    **Section 1983**

To set forth a claim under § 1983, the Plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Trautvetter v. Quick*, 916 F.2d 1140, 1148 (7th Cir. 1990) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). Section

1983 only provides a cause of action for deprivations "caused by the exercise of some right or privilege created by the State or by a person for whom the State is responsible, and the party charged with the deprivation must be a person who may fairly be said to be a state actor." *West*, 487 U.S. at 49 (ellipses and quotation marks omitted); *See also Edgar v. Inland Steel*, 744 F.2d 1276, 1278 (7th Cir. 1984) ("The [§ 1983] statute, by its express terms, is directed only to state wrongdoing."); *Dist. of Columbia v. Carter*, 409 U.S. 418, 424–25 (1973) (explaining that § 1983 does not apply to federal actors).

Because Crane was not acting under color of state law, the Court finds that the Complaint does not set forth a valid § 1983 claim. Crane's completion of an affidavit purporting to support the arrest of the Plaintiff on state criminal charges did not alter the federal source of his authority. *See* 39 C.F.R. § 233.1 (granting arrest and investigative powers to the Office of Inspector General with respect to postal employee misconduct). Nor does the Court read the Complaint as setting forth any claim that Crane conspired with the prosecuting attorney to deprive the Plaintiff of her constitutional rights. *See Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998) (setting forth requirements to establish § 1983 liability through a conspiracy between a state actor and non-state actor).

Accordingly, the Second Amended Complaint fails to state a claim for relief under 42 U.S.C. § 1983, and that count will be dismissed.


## CONCLUSION

For the reasons stated above, the Defendants' Motion to Dismiss [ECF No. 45] is GRANTED IN PART and DENIED IN PART. Defendants Antinucci and Freimuth are

dismissed as Defendants. Count II remains pending against Defendant Crane. Counts VI and VII

remain pending against the United States, and Count IV remains pending as to potential

damages.

SO ORDERED on November 20, 2018.

 s/ Theresa L. Springmann_____
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT