UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JACKIE S. BENNETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Cause No. 1:16-CV-423-HAB |
| ) | |
| JAMES CRANE, and THE UNITED ) | |
| STATES OF AMERICA, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Plaintiff Jackie S. Bennett ("Bennett") is a woman whose only crime was having a boss that could not do simple arithmetic. Nonetheless, she was charged with two felonies and imprisoned for six days based on an affidavit of probable cause submitted by Defendant James Crane ("Crane"). Bennett now seeks compensation for her arrest and detention through a *Bivens* claim and several Indiana common law claims via the Federal Tort Claims Act.

Crane and the United States, of course, contend that no compensation is owed. They assert that Crane's once-over-lightly investigation established probable cause to believe that Bennett committed the crimes charged and that, in any event, Crane's affidavit was good enough for an Allen County magistrate. As a result, the Defendants claim that no constitutional or common law violation occurred. They now seek summary judgment on all Bennett's claims.

**A. Factual Background**

In May 2013, Bennett was hired by the United States Postal Service for the position of postal clerk at the Monroeville, Indiana, Post Office. Bennett was essentially a teller, selling stamps, accepting packages, and otherwise handling the customer service side of the post office. At the end of each day, Bennett was responsible for reconciling the cash register, including

properly accounting for all money orders, postage, and retail item sales as well as all cash received. Bennett was also tasked with completing daily financial reports reflecting daily transactions and inventory. There is no evidence in the record indicating that there was ever a problem with Bennett's financial accounting or reports.

On January 24, 2014, Bennett abruptly resigned her position, effective immediately, via email to her supervisor, Denise Antinnucci. When Bennett said "effectively immediately" she meant immediately; Bennett walked off the job without performing her daily reconciliation. According to Antinnucci, this was the first time that an employee under her supervision had quit without performing the daily accounting.

A week after Bennett's resignation, Antinnucci and Cheryl Freimuth, a financial supervisor with the USPS, conducted an "initial audit" of the Monroeville Post Office. From that audit, Antinnucci and Freimuth concluded that there was a shortage of $995.51 at the post office. After further checking, that number was revised to $848.97.

As a result of the shortfall, Antinnucci sent a "Letter of Demand for Indebtedness" (the "Letter") to Bennett's home address. The Letter read, in its entirety:

> This will serve to notify you of the US Postal Service's intention to collect from you the sum of $848.97 This debt is based on a shortage in your office accountability.
>
> In accordance with the terms and conditions of Article 28 of the National Agreement, employees are held financially liable for the proper care and handling of US Postal Service funds.
> You have the right to file a grievance in accordance with Article 15 of the National Agreement within 14 days of your receipt of this letter.
>
> You must pay the above amount in full by sending a check made out to the US Postal Service and send directly to the following address.
>
> USPS DISBURSING OFFICER
> ACCOUNTING SERVICE CENTER
> 2825 LONE OAK PKWY
> EAGAN MN 55121-9640
>
> To insure proper credit please return this letter with the payment.

(ECF No. 79-1). Bennett paid the money as demanded in the Letter.

Unsatisfied with the pound of financial flesh exacted from Bennett, the USPS referred the matter to its Office of Inspector General for a criminal investigation. Crane, a special agent with the OIG, was assigned to investigate the case. Crane's "investigation" was limited. He interviewed Antinnucci and Freimuth, reviewed their handwritten calculations, read the Letter, and verified that Bennett paid the amount demanded. Crane then called Bennett, who again verified that she had paid the amount demanded by the Letter. Bennett denied having stolen any money. Crane claims that Bennett told him that a more in-depth interview could be conducted later, but no other interview occurred. Bennett never contacted Crane to set up an interview, and Crane was unsuccessful in reaching Bennett during two follow-up attempts.

Crane found all of this to be very suspicious. He found it "highly unusual" for an employee to quit without performing the daily accounting, believed it was common for thieves to pay back amounts if they could, and found Bennett's denial of criminal conduct indicative of her guilt. Accordingly, Crane referred the matter to the Allen County Prosecutor for possible criminal charges. Deputy prosecutor Timothy McCauley drafted an affidavit for probable cause that Crane reviewed and signed. The affidavit was then filed in Allen Superior Court, and Magistrate Judge Robert Schmoll found probable cause to issue a warrant for Bennett's arrest. Bennett was arrested on December 18, 2014, on charges of theft and official misconduct. She spent the next six days in jail before bonding out.

The day after Bennett was arrested, Postmaster Krista Carr conducted her own audit of the Monroeville Post Office to "clarify" the audits performed by Antinnucci and Freimuth. Carr concluded that no money was ever missing from the post office. In relevant part, Carr's report of her audit concluded:

3

> My findings indicate there was never a shortage to begin with. The documentation for this financial mess is exactly that – a mess! This office is in terrible shape – not only on the financial side but also in every instance.
>
> * * * *
>
> Jackie Bennett needs to be reimbursed for the full amount that she has paid back - $848.97 along with an apology.
>
> In my opinion, the office should never have been transferred to Jackie when it was clearly in such deplorable conditions. She had only been with the Postal Service for approximately 5 months and put in an office that would take someone with years of experience and many extra hours to clean up.

(ECF No. 41-1 at 22).

After completing her audit, Carr called Crane to let him know that no money had ever been missing from the Monroeville Post Office. Crane then sent an email to McCauley stating that any shortfall attributed to Bennett was a "Records/Book Keeping" error. (*Id*. at 20). Crane also made sure to "apologize" ***to McCauley*** "for the inconvenience that this case has caused." (*Id*.). Charges against Bennett were not dismissed until January 8, 2015.

**B.      Legal Discussion**

**1.      *Summary Judgment Standard***

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

4

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.' " *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

**2.    *The Bivens Claim***

Bennett's first claim alleges that Crane violated the Fourth Amendment by pursuing criminal charges against Bennett without probable cause. To state a prima facie *Bivens* claim, the Court applies the same elements as it would if the claim was brought pursuant to 42 U.S.C. §1983. Indeed, "actions under [42 U.S.C.] §1983 and those under . . . *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), are identical save for the replacement of a state actor (§1983) by a federal actor (*Bivens*)." *Bieneman v. Chicago,* 864 F.2d 463, 469 (7th Cir. 1988). To avoid summary judgment then, Bennett must raise a genuine issue of material fact that (1) Crane violated her Fourth Amendment rights; (2) the right was clearly established; (3) Crane was a federal actor by virtue of acting under color of federal law, and (4) Crane was personally involved in the alleged violation. *See Tom Beu Xiong v. Fischer*, 787 F.3d 389, 397 (7th Cir. 2015) (elements 1, 2, and 3); *Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003) (element 4). Moreover, when a plaintiff brings an action for money damages against a federal official in his individual capacity, the official

5

may be entitled to qualified immunity insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Crane admits that he was a federal actor and that he was personally involved in the investigation that resulted in Bennett's charges. The question before the Court, then, is whether Crane violated a clearly established right in seeking criminal charges against Bennett.

"Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and section 1983." *Muhammad v. Pearson*, 900 F.3d 898, 907 (7th Cir. 2018) (citation omitted). "Probable cause exists to arrest a suspect if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019) (citation omitted).

When a judge authorizes an arrest, as one did here, "we presume the validity of [the] warrant and the information offered to support it." *Id*. (citation and internal quotation marks omitted). The presumption must give way, however, "if the warrant application was 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1060 (7th Cir. 2018) (quoting *Junkert v. Massey*, 610 F.3d 364, 369 (7th Cir. 2010) (quoting *Malley v. Briggs*, 475 U.S. 335, 345 (1986))). "Under these circumstances, even a facially valid arrest warrant does not shield otherwise unreasonable conduct." *Williamson v. Curran*, 714 F.3d 432, 444 (7th Cir. 2013) (citation omitted).

"An officer faces personal liability only if 'courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand' or if 'the affidavit is so plainly deficient that any reasonably

well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *Edwards*, 907 F.3d at 1060 (quoting *United States v. Koerth*, 312 F.3d 862, 870 (7th Cir. 2002)); *see also Brunson v. Murray*, 843 F.3d 698, 709 (7th Cir. 2016).

Since the official misconduct charge rises and falls on the theft allegations, *Heinzman v. State*, 895 N.E.2d 716, 723 (Ind. Ct. App. 2008), Bennett's claim hinges on whether Crane had probable cause to believe that she committed theft. Ind. Code § 35-43-4-2(a) provides that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft."[1] Probable cause does not require the type of evidence on each element necessary to support a conviction, *Adams v. Williams*, 407 U.S. 143, 149 (1972), but these elements nonetheless frame the question as to whether Crane had reason to believe that Bennett had committed an offense.

Indiana's theft statute contains multiple *mens rea* elements, requiring that an individual "knowingly or intentionally" exert control over property "with the intent" to deprive the owner. Where *mens rea* is an element, police must develop some evidence of the requisite mental state. *BeVier v. Hucal*, 806 F.2d 123, 126 (7th Cir. 1986) (holding that the police "needed some evidence" of intent to establish probable cause under a statute proscribing knowing or willful conduct) (emphasis added); *see also Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007) (concluding that a police officer needed "some evidence" of intent to arrest an individual). When it comes to specific intent crimes, the need for probable cause on the intent element is particularly acute. *See Jordan*, 487 F.3d at 1355–56 (collecting cases). This is especially so in the context of long, drawn-out investigations where officers do not have to "definitively resolve difficult *mens*

---

[1] Bennett's charge was elevated to a felony because of the amount in question. I.C. § 35-43-4-2(a)(1).

7

*rea* questions in the few moments in which officers have to decide whether to make an arrest." *Wesby v. District of Columbia*, 816 F.3d 96, 107–08 (D.C. Cir. 2016) (Kavanaugh, J., dissenting from denial of rehearing en banc) (collecting cases). Because officers must typically think on their feet, courts usually allow an inference of specific intent from the defendant's conduct. *See United States v. Schwanke*, 694 F.3d 894, 896–97 (7th Cir. 2012) (collecting cases); *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000) (endorsing circumstantial evidence of criminal motive); *Stefani v. City of Grovetown*, 780 F. App'x 842, 849 (11th Cir. 2019).

That being said, the Seventh Circuit has "repeatedly held that it is up to the courts, not police officers, to determine a suspect's mental state." *Shea v. Muensterman*, 2 F. App'x 528, 529 (7th Cir. 2001) (collecting cases). On the ground, it is not a police function to "sort[] out conflicting testimony and assess[] the credibility of putative victims and witnesses . . . ." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 745 (7th Cir. 2003) (collecting cases); *see also Hebron v. Touhy*, 18 F.3d 421, 423 (7th Cir. 1994) ("Police have a hard time evaluating competing claims about motive; they are entitled to act on the basis of observable events and let courts resolve conflicts about mental states."); *Marks v. Carmody*, 234 F.3d 1006, 1009 (7th Cir. 2000).

Turning to the evidence here, the Court must start from the presumption that both the warrant and the information offered to support it are valid; Magistrate Schmoll's signature compels such a starting point. But the Court finds that Magistrate Schmoll's signature is the only thing about this case that even hints that a crime has been committed, much less that it was committed by Bennett. Having reviewed the affidavit, and all the evidence designated by Crane in support, the Court is left with the firm conclusion that a reasonable juror could find that Crane lacked probable cause to pursue charges against Bennett.

8

The problems with Crane's affidavit start at the most basic level—whether money was ever missing in the first place. The evidence suggests that Crane credited entirely Antinnucci and Freimuth's audit, what even he describes as an "initial audit" in his affidavit for probable cause. (ECF No. 41-1 at 15). The Court could, perhaps, be convinced that Crane's reliance on the audit was reasonable. Freimuth, at least, was a "financial supervisor," so it might have been reasonable for Crane to take her word for it that cash was missing. *Gramenos v. Jewel Co., Inc.*, 797 F.2d 432, 439 (7th Cir. 1986). But even crediting Crane on this threshold question is difficult. Antinnucci's handwritten scribblings, which Crane affirms that he reviewed, do not fill the Court with great amounts of assurance as to their accuracy. (*See*, *e.g.*, ECF No. 79-3 at 8–14). This is particularly true because Crane knew that the amount of the alleged shortfall had already changed after "further investigation." (ECF No. 41-1 at 15). And while information developed after the fact does not enter into the Court's analysis, it would be remiss if it did not point out just how easily Carr was able to debunk the legend of the missing currency. Presumably, Crane could have done the same had he put a modicum of effort into his investigatory role.

The threshold issue aside, the Court finds no evidence to support a suspicion, reasonable or otherwise, that Bennett stole any money from the Monroeville Post Office. Crane first points to Bennett's act of quitting without notice, arguing that "both Antinnucci and Agent Crane had been with the Postal Service many years and found this activity highly unusual, if not singular." (ECF No. 79 at 13). This statement strains the limits of credulity. This is the Postal Service, after all, an agency whose employees are so famously disgruntled as to give rise to the phrase "going postal." Moreover, while two weeks' notice may have been the norm at one time, quitting without notice has become so prevalent today that it was mentioned prominently in the Federal Reserve's Beige Book, the twice-quarterly summary of national economic conditions. *See* Board of Governors of

9

the Federal Reserve System, *Beige Book – December 5, 2018*, Employment and Wages Summary, https://www.federalreserve.gov/monetarypolicy/beigebook201812.htm (noting that "several Chicago firms reported that some employees have simply quit – with no notice nor means of contact."). The Court finds it difficult to believe that post office locations in northeast Indiana have somehow managed to avoid having *anyone* quit without notice. But even if they have, Defendants do not explain how walking off the job translates to evidence of theft. Bennett may very well be a bad (former) employee, but that does not make her a thief.

Crane next relies on the fact that Bennett reimbursed the USPS in response to the Letter. Crane argues that he was "entitled to rely on the commonsense notion that people do not ordinarily pay back large sums of money that they do not owe, as well as his past experience of Postal employees who had stolen funds paying back the money when able to do so." (ECF No. 79 at 13). Whether or not this notion is "commonsense," it belies a misunderstanding as to the basis of the USPS' reimbursement request.

As the Letter notes, the reimbursement request was made pursuant to "Article 28 of the National Agreement." (ECF No. 79-1). Although neither party designated or even discussed the National Agreement, the Court has been able to discern that the National Agreement is the collective bargaining agreement between the National Association of Letter Carriers (AFL-CIO) and the USPS. *See* https://www.nalc.org/workplace-issues/resources/agreemnt/National-Agreement-2016-2019.pdf. Article 28 of the National Agreement addresses "Employer Claims," and provides in relevant part:

> Employees who are assigned fixed credits or vending credits shall be strictly accountable for the amount of the credit. If any shortage occurs, the employee shall be financially liable unless the employee exercises reasonable care in the performance of his/her duties.

*Id.* at 97–98.

The Court finds two phrases in Article 28 to be particularly relevant: "strictly accountable" and "reasonable care." What both phrases demonstrate is that the USPS does not need to establish criminal culpability in order to seek reimbursement for cash drawers that come up short. The USPS does not need to establish that the employee took the missing money or ever had it in her possession. Instead, the USPS need only establish negligence on the part of the employee in handling funds. *See Jeffords v. BP Prods. N.A. Inc.*, --- F.3d. ---, *1 (7th Cir. 2020) (discussing reasonable care in the context of Indiana negligence law). To the extent that Bennett's payment was an admission, it was to conduct that falls far short of anything that would substantiate criminal charges.

Crane also seems to fault Bennett for not challenging the reimbursement request. True, Article 15 of the National Agreement does contain a grievance process for those employees who wish to challenge certain determinations by the USPS. *See* https://www.nalc.org/workplace-issues/resources/agreemnt/National-Agreement-2016-2019.pdf at 64–77. However, that process is fourteen pages long and includes an informal step, two formal steps, an initial arbitration step (divided into two different paths depending on the complexity of the issue), and national level arbitration. The Court does not find it unreasonable, much less indicative of a crime, that an individual would make the economic decision to forego this time consuming and expensive process in favor of making a payment of just over $800. This is particularly true where, as here, the individual likely failed to exercise reasonable care when she walked off the job without completing her accounting.

Finally, Crane relies on his brief phone call with Bennett to support the probable cause determination. Crane avers that guilty people often deny culpability and faults Bennett for failing to schedule a more formal interview. The first point is almost too ridiculous to merit discussion. It

is likely true that many individuals guilty of a crime deny involvement when first questioned, but so too does another class of individuals: the innocent.[2] And whether or not Bennett's failure to schedule a formal interview could be seen as suspicious, she disputes Crane's description of the call. According to Bennett, she believed that Crane's call was "the end of the matter, and she had no further contact with [Crane] after" the call. (ECF No. 41-1 at 3). Thus, there exists an issue of fact as to whether Bennett was even expected to schedule an interview, undercutting Crane's attempt to use the call as a basis for summary judgment.

Taking all the foregoing into account, the Court finds that a reasonable juror could determine that Crane lacked probable cause to pursue charges against Bennett, Magistrate Schmoll's approval notwithstanding. The evidence known to Crane at the time he submitted the Affidavit for Probable Cause established, at most, a reasonable suspicion that Bennett's negligence had resulted in money missing from the Monroeville Post Office. But "[i]f an officer or employee of a corporation exceeds his authority, and the funds of the corporation are lost, he may be civilly liable, but, unless he acts from a dishonest motive, he is not guilty of a crime." *Cohn v. State*, 208 Ind. 277 (1935) (discussing Indiana's theft statute). Here, Crane had no evidence that Bennett was ever in possession of the (not actually) missing funds, and therefore no evidence that a crime had even been committed in the first place. Without any evidence of a crime, the Court cannot find as a matter of law that probable cause existed.

The Court finds support for its conclusion in the Indiana Court of Appeals' decision in *Kroger Food Stores, Inc. v. Clark*, 598 N.E.2d 1084 (Ind. Ct. App. 1992). In *Clark*, the plaintiff's

---

[2] The Court would also note the internal inconsistency in this line of "logic," if it can be called that. Crane found Bennett's failure to deny culpability in the context of the Letter to be suspicious, while at the same time finding her denial to be suspicious when it was made to him on the phone. What would Crane have Bennett do? How would he prefer she have responded? Crane's damned-if-you-do-damned-if-you-don't rationale is evidence to the Court that he was not conducting an investigation as much as he was simply checking off boxes in preparation for bringing charges.

supervisor began to suspect that the plaintiff, a cashier, was taking advantage of a store promotion to steal money. The supervisor reviewed the plaintiff's register detail tape and concluded, for several consecutive days, that she could not reconcile the tape with the number of promotional cards redeemed. No other individual ever reviewed the tapes. The supervisor shared her suspicions with the store's security officer, who monitored the plaintiff for a six-week period. The security officer found no evidence that the plaintiff was removing money from her register. Nonetheless, and despite her denials, the plaintiff was charged with theft and acquitted. The plaintiff subsequently filed suit against Kroger and, following a bench trial, was awarded more than $1,000,000.00 in compensatory and punitive damages. *Id*. at 1086–87.

Both the finding in favor of the plaintiff and the damage award were affirmed on appeal. The Court of Appeals found that the entire investigation was deficient. In an excerpt that could apply with equal force to the case at bar, the court found:

> In fact, the record establishes that other than interview Clark, check on some of the addresses written on the cards, and watch Clark for a period of time, Kroger's investigators did nothing other than retrace the steps taken by [the supervisor]. Although Kroger's investigators examined the register tapes, pick-up slips, and cards, they relied entirely on [the supervisor's] explanation of the register tapes without independently attempting to verify her reading of them. As a consequence, their "review" of the documentation did nothing to substantiate [the supervisor's] suspicions. The admission obtained by investigators from Clark that she may have improperly rung up K-card transactions is at best an indication that she violated store policy, which it turns out had never been communicated to the cashiers by [the supervisor]. Kroger concedes that its surveillance of Clark proved fruitless.

*Id*. at 1088. In summary, the court held that "[t]o continue to maintain the belief that an employee has engaged in theft in the face of a simple and 'probable' explanation which is readily discoverable and without some evidence that anything had ever been taken is simply not objectively reasonable." *Id*.

13

Arguably, Crane did even less "investigation" than did the investigator in *Clark*. Crane interviewed Antinnucci and Freimuth, reviewed Antinnucci's handwritten audit results, and had a short discussion with Bennett. He made no effort to independently verify the results of the audit, and therefore did nothing to substantiate the belief that funds were missing. Crane did verify that Bennett had reimbursed the USPS, but as noted above this was, at most, an admission of negligence. There appears to have been no effort whatsoever to obtain evidence that Bennett took the missing funds. Crane, then, did little more than maintain a belief that Bennett engaged in theft without any evidence that anything had ever been taken. Just as in *Clark*, this "is simply not objectively reasonable."

Crane's failure to adduce evidence of a crime is even more problematic given the length of time over which the "investigation" took place. Nearly 12 months elapsed between the alleged theft and Bennett's arrest. Crane, then, was not tasked with making credibility determinations "in the few moments in which officers have to decide whether to make an arrest." *Wesby*, supra. Crane's investigation disclosed no "competing claims about motive" or "conflicts about mental states," let alone observable events on which to support probable cause. *See Dollard v. Whisenand*, 946 F.3d 342, 360 (7th Cir. 2019). While probable cause did not require Crane to have certainty of Bennett's intent, it did require *some* evidence. Crane failed to develop even this minimal amount of *mens rea* evidence.

In addition, "[r]easonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place." *BeVier*, 806 F.2d at 128. It is not enough for an officer to choose not to explore further when doing so would undoubtedly shed light on the situation. Crane failed to confirm that money was missing and did nothing to confirm that Bennett ever possessed the money (like, for instance, investigate her financial records. Without more than

14

the possibility that money was missing from Bennett's post office, the undisputed facts did not give Crane a reasonable basis to determine that Bennett had committed a crime.

Although the Court concludes that a reasonable jury could find that Crane violated Bennett's Fourth Amendment rights, the question remains as to whether Crane is nonetheless entitled to qualified immunity. Crane can only be held liable if "'courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand' or if 'the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *Edwards*, 907 F.3d at 1060 (quoting *Koerth*, 312 F.3d at 870).

Bennett has pointed to no case law where a court has held that a "materially similar affidavit" failed to establish probable cause "under facts that were indistinguishable from those presented in the case at hand." The Court finds that *Clark* comes close, but there are certainly facts upon which the two cases could be distinguished. Thus, the inquiry must turn as to whether a reasonable officer would have known that the affidavit failed to establish probable cause and that Crane should not have applied for the warrant.

On this point, the Court once again finds that a reasonable jury could find against Crane. A review of Crane's affidavit fails to establish that a crime was committed, much less that Bennett committed a crime. Crane did not confirm that money was missing. There is no evidence in the affidavit connecting Bennett to any money that might have been missing. There is no evidence of the required intent to commit theft. In short, the Court finds that a reasonable jury could conclude that no reasonable officer would have believed that Crane's Affidavit established probable cause.

Probable cause for theft charges does not exist every time a cashier's drawer comes up short, a delivery man returns from his run with less than the full amount of the order, or a stamp sales ledger does not line up with an accounting of cash in the door. There are any number of innocent explanations for each circumstance, from the non-criminal (money was lost) to the non-existent (the money was there all along). While Crane was not required to eliminate all possible contingencies other than criminal conduct, he was required to develop facts that met the legal requirement of probable cause before pursuing multiple felony charges against an innocent woman. He failed to do so here. Therefore, Crane is not entitled to summary judgment on Bennett's *Bivens* claim.

**3.**     ***The FTCA Claim***

Bennett additionally brings claims under the Federal Tort Claims Act for violation of Indiana common law. The FTCA is a limited waiver of the United States' sovereign immunity. *Warrum v. United States*, 427 F.3d 1048, 1049–50 (7th Cir. 2005). It exposes the United States to liability for personal injuries as a result of its negligence to the same extent that a private person would be liable under the law of the place where the negligence occurred. *See* 28 U.S.C. § 1346(b)(1). Here, Bennett claims that the United States is liable for false arrest, malicious prosecution, and negligent infliction of emotional distress.

FTCA claims incorporate the substantive law of the state where the tortious act or omission occurred. *Augustis v. United States*, 732 F.3d 749, 752 (7th Cir. 2013). Unfortunately for Bennett, Indiana law places far more significance on Magistrate Schmoll's signature than does federal law. With respect to both false arrest and malicious prosecution claims, a judicial determination amounts to prima facie showing of probable cause rebuttable only by evidence showing that the finding of probable cause was induced by fraud or false testimony. *Ali v. Alliance Home Health*

*Care, LLC*, 53 N.E.3d 420, 432–33 (Ind. Ct. App. 2016); *Clark*, 598 N.E.2d at 1089. While the Court believes that Crane's investigation was slap-dash, superficial, and constitutionally deficient, it does not find that Crane's affidavit contains fraud or false testimony.

The only falsehood identified by Bennett is Crane's assertion that he personally reviewed business records. The Court agrees with Bennett that Crane did not review *enough* business records, but that does not mean he reviewed *no* business records. Crane's report to McCauley identifies six different business records reviewed by Crane. The Court has no basis to believe that Crane did not review these records. With no other potential fraud or falsehood having been identified, the Court concludes that Bennett's claims for false arrest and malicious prosecution must fail.

The Court finds that Bennett's negligent infliction of emotional distress claim meets the same fate. Negligent infliction of emotional distress is not a stand-alone claim in Indiana. *Spangler v. Bechtel*, 958 N.E.2d 458, 466 (Ind. 2011). Instead, a plaintiff may seek damages for negligent infliction of emotional distress if he suffers "a direct impact by the negligence of another and, by virtue of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person[.]" *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991). Thus, a plaintiff who proceeds under the modified impact rule must show that he suffered a direct physical impact. *Atlantic Coast Airlines v. Cook*, 857 N.E.2d 989, 996 (Ind. 2006).

A constitutional tort cognizable under § 1983 can support a claim for negligent infliction of emotional distress. *Higginbottom ex rel. Davis v. Keithley*, 103 F.Supp.2d 1075, 1089–90 (S.D. Ind. 1999). However, Indiana law requires that the "impact" forming the predicate for the emotional distress claim be committed by the defendant. *Neff v. Wal-Mart Stores East, LP*, 113

N.E.3d 666, 673 (Ind. Ct. App. 2018). There is no evidence here that Crane or any other agent of the United States ever impacted Bennett. Instead, her arrest was, presumably, conducted by local law enforcement where she lived. Bennett cannot satisfy the modified impact rule, and the United States is entitled to summary judgment on all FTCA claims.

**C.     Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 78) is GRANTED in part and DENIED in part. Summary judgment in favor of Defendants and against Plaintiff is granted with respect to Counts IV, VI, and VII. Summary judgment is denied with respect to Count II.

SO ORDERED on July 21, 2020.

       s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT